# KELLY

*v.*

## LARGNEY.

*(Supreme Court of Appeals of Virginia, Nov. 19, 1874.)*

### Contract to Build a Tunnel—Case at Bar.

On the 14th of February, 1850, John Kelly, John Largney and Christian Detmold, as partners under the firm name of John Kelly & Co., contracted with the Board of Public Works under the corporate name of the Blue Ridge R. R. Co., for the construction of the Blue Ridge tunnel. They continued to perform their contract until the 15th of March, 1851, when, by mutual consent, this contract was abandoned, and a new one entered into between John Kelly and John Largney, as partners under the name of Kelly & Largney. This last contract was similar to the first except that it provided for advances by the Board of Public Works in the shape of loans to enable the contractors to complete the work undertaken by them, and also provided that they should be indemnified against loss if they should complete the work. In 1851, they applied to the board to allow them some compensation for their labor, and a resolution was adopted by the board allowing them a commission of 10 per cent. on their actual expenditures. This resolution was accepted by Kelly and Largney and under it they completed the work in 1857. The board required that one of them should conduct all the business under the contract with the board, and in pursuance of this contract John Kelly was designated who consequently presented all the estimates and claims and received all payments. John Largney superintended the actual execution of the work making all disbursements for labor and supplies until May, 1857, when Kelly made them from that month until the completion of the work. The claim of the appellee is that Largney, his intestate, in the progress of the work, made advances out of his private resources in aid of the joint enterprise to the amount of $14,531.19, for which Kelly is indebted to him for half: *held* :

### Same—Same.

1. That upon the facts of this case which further appear in the opinion Largney was entitled to a decree for $14,531.19.

**Same—Partnerships—What Constitutes.**

2. That though the state defrayed the expenditures and the parties were compensated by a commission on the amount, yet the commission constituted *profits* in which they were jointly interested, and such community of interest in *profits* will generally constitute a partnership.

**Winding up Partnership—Jurisdiction.**

3. That a court of equity has jurisdiction to wind up partnership transactions.

This is an appeal from circuit court of Alleghany county in which John Kelly is appellant and John Largney appellee.

See the opinion for further facts.

*Wm. Skeen*, for appellant.

*Parrish*, *Edmund Pendleton*, and *Echols*, *Bell & Catlett*, for appellee.

CHRISTIAN, J., delivered the opinion of the court.

We think there can be no doubt but that a court of chancery had jurisdiction in this case. There was, unquestionably, a partnership existing between the parties; and the suit was brought to settle the accounts of that partnership and recover the balance claimed to be due upon it, one against the other. They were engaged in a very heavy joint adventure, which was carried on for a period of six or seven years, and involved the expenditure of nearly half a million dollars. Though the state defrayed that expenditure, and the partners were to be compensated by a commission on the amount, yet the commission constituted profits in which they were jointly interested. A community of interest in the profits of a partnership, will, generally at least, suffice to constitute a partnership. Parsons on Partnership, page 67. But there were

other grounds on which they were partners. They jointly undertook the execution of this work and would have been jointly, as well as severally, liable for any default or neglect which might have arisen in the course of its execution. They were jointly bound to bear the burdens of their undertaking; though by contract *inter se*, they agreed to sever their duties and become, one of them the financial, and the other the acting member of the concern, the duty of the latter being to manage and superintend the execution of the work, if not actively engaged in the same. They certainly considered and called themselves partners, and were so considered and called by those who dealt with them. Since the death of one of them, the other has brought suits for large amounts as surviving partner; has recovered a large sum of money in one of them, and divided it with the representative of his deceased partner; and is yet prosecuting another of these suits. "Although partnerships," says Parsons, "are usually formed for commercial purposes, they are not always so; and there is scarcely any occupation which an individual can legally pursue, that may not be the subject of partnership." "Thus we have partnerships, not only for every known branch of commercial business, but for all kinds of farming, or manufacturing, mining, stage driving, fishing, hunting, lumbering and the like, as well as the business of lawyers, physicians, mechanics, artists, laborers, and indeed of almost all other employments." Id. p. 36. If lawyers or others associate for the purpose of collecting claims on commission, the fact that their profits consist of their commission, would certainly not prevent them from being partners, though they would also, in effect, be hirelings or agents of those who might employ them for the collection of claims. The court then, certainly did not err in taking and exercising jurisdiction in this case.

And now as to the merits of the case. The main, if not the only question of controversy in this case is, whether the

claim of the plaintiff, as shown by Exhibit D, filed with the bill, ought to be credited by the amount of the receipt of the 26th of May, 1856, for $14,118.51, referred to in the answer, being the exhibit marked A, and inserted in the record. We will, therefore, at once, address ourselves to the solution of that question.

The defendant, Kelly, contends that the amount of the receipt is applicable to the payment of estimates included in Exhibit D, being those which were made between March, 1856, and April, 1857, inclusive; whereas the plaintiff, Largney's administrator, contends that the said amount is applicable to the payment of estimates not included in that exhibit but which were made before the 1st of March, 1856; and especially those which were made for the months of November and December, 1855, and January and February, 1856. Which of these parties is right in this contention?

The Receipt A bears date within the period embraced by Exhibit D, to wit, on the 26th of May, 1856; from which it might be said, *prima facie*, to appear to be applicable to the estimates, or some of them, embraced in Exhibit D. And the parties, moreover, agreed that all the transactions between them anterior to the 1st of March, 1856, should be considered as settled and should not be taken into the account before the commissioner. And this agreement would seem to lend color to the presumption that a receipt, dated after the 1st of March, and after estimates were made subsequent to that day and prior to the date of that receipt, was properly applicable to those estimates.

But we find, on further investigation, that while all the estimates that had been made prior to the 1st of March, 1856, had, in fact, been settled and paid before the institution of the suit; yet, such payment had not, in fact, been fully made before the said 1st of March; but, on the contrary, a very large amount was, in fact, paid subsequently to that day, on account of estimates made before that day.

For example : We find, by a receipt filed in the cause by the defendant on the day before the final decree was rendered, that on the 28th and 29th of April, 1856, Kelly paid to Largney $16,445.87, "being amount overpaid for the work to 1st November, 1855,"—that is, overpaid by Largney—thus showing that Largney did not receive this large amount until nearly six months after the work for which the payment was made was done, and probably six months after the money had been advanced by Largney. Thus there is nothing in the mere date of the receipt in controversy which can throw light upon the question whether it is properly applicable to estimates made before or to estimates made after the 1st day of March, 1856.

And now let us look at another important fact in the case. The first credit on Exhibit D is "1856, April 25th, by cash received through John Kelly, $10,020.26," which, we think, was clearly intended to be applied to the estimate of $10,100.62, made in March, 1856. On reference to the receipt which was given for that payment, being receipt B inserted in the record, we find that it bears date June 24th, 1856, instead of April 25th, 1856, the date mentioned in Exhibit D. Taking June 24th, 1856, to be the true date of the payment, as we must, then, if that payment be applicable, as we say, to the estimate for March, 1856, and if the appellant be right in contending that the receipt marked A, dated May 26th, 1856, is applicable to estimates included in Exhibit D, it must be applicable to estimates made after March, 1856, and before May 26th, 1856. But the only estimate made between these two periods was that of April, 1856, $9,516.65. The estimate for May, 1856, had not been made, or at all events was not payable, on the 26th of that month, the date of Receipt A, as the estimates were not considered payable and were not paid until about a month after they were made. In that view, therefore, the defendant made a large part of

this large payment on account of estimates which has not been made ; if not on account of work which had not actually been done.   And that too, when we see that not a month before, to wit : on the 28th and 29th of April, 1856, he had just paid $16,445.87, "being amount overpaid for work to 1st November, 1855."

Now how and when were the estimates paid for November and December, 1855, and January and February, 1856 ?    We see how and when the estimates were paid in full to the 1st of November, 1855.   We see that on the 28th and 29th of April, 1856, $16,445.87 were paid in full of the balance due on those estimates, from which we·may reasonably infer, that the whole of the estimates for the four intervening months above mentioned, remained unpaid on the 29th of April, 1856.   It is not pretended that estimates were not made for those months, as had monthly been made both before and afterwards, while the work was in course of execution.   The presumption is irresistible that such estimates for those four months were in fact made.   Nothing would have been easier for Kelly to have shown the fact if they were not made.   And nothing is more certain that he would have shown it, if in fact they were not made, for it would have conclusively sustained his defence and ensured a dismissal of the bill.

What was the amount of the estimates for four months ?  We do not know, because we are not informed by the record.   But we can come sufficiently near the amount for the purposes of this case.   We see from Exhibit D that the estimates for the thirteen months included therein vary from $4,142.88, the lowest, to $10,100.62, the highest.   And the average seems to be not less than $7,000.00 per month. Say that the total amount of the estimates for these four months was $25,000.00.   How and when was this amount paid ?   The circumstances of the case loudly called on Kelly

for proof of such payment, in order to sustain his defence. That defence consists of his claim to an additional credit for $14,118.51, the amount of Receipt A, dated May 26th, 1856. He exhibited another receipt showing that less than a month before, to wit, on the 28th and 29th of April, 1856, he had paid $16,445.87 in full to the 1st of November, 1855. How and when was the large sum due for the estimates of the four months intervening between that date and the 1st of March, 1856, which we have reasonably estimated at not less than $25,000.00, paid? In this state of things, Kelly exhibits Receipt A for $14,118.57, dated May 26th, 1856, less than one month after the date of his receipt for payment in full to 1st of November, 1855, and claims credit for the amount of estimates made since the 1st of March, 1856. The items of receipt A are just as applicable to estimates made before as those made after the 1st of March, 1856, and there is just as much correspondence in amount in the one case as the other. In other words, there is no such correspondence in either case as to indicate to what the amount of the receipt was intended to be applied. It is said the receipt should have specified the estimates before March, 1856, if it had been intended to be applied to them. But why so? It is not pretended that the payment mentioned in that receipt was *in full* of any estimate or estimates. It may have been, and no doubt was, on account and in part of the estimates before the 1st of March. And if so, it was in proper form. The receipts B, C and D, immediately succeeding Receipt A, are, substantially, in the same form as A, as are many of the other receipts exhibited, and are not in terms in full nor on account of any particular estimate. If, as we suppose, the amount of Receipt A was paid merely *on account* of estimates preceding the 1st of March, 1856, there was, no doubt, a full and final payment on account, shortly afterwards, for which Kelly has a receipt, the exhibit of which would explain the whole matter.

There is nothing in the date of the 1st of March, 1856, which would have induced the parties to vary the forms of the receipts given before and after that day for estimates made before or afterwards. That date was fixed upon in making out Exhibit D, because when that exhibit was made out, all the estimates before that date, had, in fact, been settled between the parties; and it was therefore considered unnecessary to take an account of their transactions prior thereto.

So much for the intrinsic evidence afforded by these receipts. Now let us look at the other evidence in the case. Only three depositions were taken in the case, and they were taken in behalf of the plaintiff, Largney's administrator. Not one was taken by the defendant, Kelly, though he cross-examined, at full length, the principal witness for the plaintiff, to wit, Jeremiah Largney. That witness was the bookkeeper, or one of the bookkeepers, and the principal one of Kelly and Largney during the whole of their joint operations. If the testimony of that witness is to be believed, the plaintiff's case is fully and conclusively proved, and he is entitled to have the decree rendered in his favor by the court below, affirmed by this court. Not a particle of evidence was introduced or offered by the defendant to impeach the testimony of that witness ; and there is not a particle of evidence in the cause in conflict with his testimony. Why then is he not to be believed ? He is wholly disinterested in the case. He is an intelligent man and is more conversant with the facts to which he testifies than any other living man in the world, unless that man be the defendant Kelly himself. The main partnership book, in which the transactions to which he testified were entered, has been lost ; but, fortunately, he had taken copies from the book, to the correctness of which he testifies, and the correctness of which, so far as relates to the questions involved in this case, was admitted by the defendant. These copies, or some of

them, were shown to him, and admitted or not denied by him to be correct ; and were used as exhibits and vouchers in support of the claim which he asserted against the board of public works for damages claimed to be due to him as surviving partner for losses on account of the depreciation of state bonds ; in which, at par, a large part of the payments was made by the state to the contractors. It is said that the witness Jeremiah Largney ought to have informed the administrator of his brother, John Largney, sooner than he did, that Kelly owed the balance as now claimed to be due by him to the estate of his deceased partner. Witness was not personally interested in that question, and no fiduciary duty or trust devolved on him in regard to it. And it may be further said in explanation of his conduct that he and Kelly and his brother's administrator were co-operating in endeavoring to recover a large amount from the state in satisfaction of two claims of the partnership, one for commission on the amount of the expenditure about the work, and the other for loss in the depreciation of state bonds. The former was recovered and divided. The latter is still involved in a suit yet pending. The witness, no doubt, believed that when this litigation was ended the matter would be settled justly between the parties. He did not suppose that Kelly would dispute the justice of the balance appearing to be due to the estate of his deceased partner, for he had admitted it ; and when the amount claimed of the government should be recovered, as was expected to be the case in a short time, he, the witness, knew there would be an ample fund of the partnership in hand to adjust all accounts between the parties. But however this may be, surely there is not enough ·in the record to impeach the testimony of this witness. In addition to his testimony there is the testimony of Shannahan, another witness for the plaintiff, which strongly sustains his claim. The testimony of this witness is likewise impeachable ; but we need not recite it, or state

in substance what it proves.    Three reports were made by commissioners in the cause under decrees therein for the settlement of the accounts between the parties, the first of which merely presents the respective pretensions of the parties, but the other two fully sustain the claim for the amount of which the decree appealed from was rendered.

In addition to all this, we have the strong negative evidence afforded by the conduct of the defendant himself. He was the surviving partner, and the duty devolved upon him to settle the partnership accounts with the personal representative of his deceased partner, and as soon as possible after such representative was appointed and qualified, which was on the 23rd day of August, 1858.    Instead of that he never did make, nor offer to make, any such settlement before the institution of this suit, which was on the 29th day of May, 1871, nearly thirteen years after the qualification of a personal representative of his deceased partner.    In the nature of things, there must have been *something* due, one way or the other, upon transactions so weighty in amount and of such long continuance.    If the balance was due *by* him, as turned out to be the case, it was all-important to the destitute family of his deceased partner that the amount should be ascertained and paid as speedily as possible.    If the balance had been the other way, it was still important that he should, as soon as possible, show the fact to the satisfaction of the family and representative of his deceased partner.    Instead of that he neither settled nor rendered any account.    And when the suit had been brought, and the bill filed against him, he put in an answer in which he rendered no account, and with which he filed no exhibits, except Nos. 1, 2 and 3 ; the first two of which are unimportant, and the last of which, No. 3, purports to be "Exhibit D, corrected by Largney's receipts."    The only material difference between No. 3 and Exhibit D is the insertion in No. 3 of the amount of the receipt of the 26th of May, 1856,

$14,118.50, which is stated as having been "left out" of Exhibit D. But he did not even file *that* receipt with his answer ; and although he must have known that Largney's administrator was claiming a balance due upon an account in which the amount of that receipt was not credited, yet he never asserted any claim to such a credit, nor exhibited, nor referred to such a receipt until he filed his answer in 1871. This, at least, was his time, if not before, to exhibit a full and fair account, and to show, if he could, that the estimates between the 1st of November, 1855, and the 1st of March, 1866, were fully accounted for and settled otherwise than by the payment mentioned in Receipt A. He ought to have exhibited all the receipts which he had for the amount of all estimates made between those two periods. But he filed no receipts with his answer, nor afterwards, until during the cross-examination of the witness, Jeremiah Largney, he exhibited such as he thought proper to produce and had them verified by the witness, reserving still in his hands other and most important receipts. And on the day before the final decree was rendered, he filed, for the first time, several important receipts which he supposed would help to sustain his defence, one of which was the receipt before referred to of the 28th and 29th of April, 1856, for $16,445.97. This negative evidence, thus afforded by the conduct of the defendant, strongly confirms the positive evidence against him, and, with the latter, makes out a case, which, we think, is conclusive in favor of the affirmance of the decree.

We have been asked by the appellant at least to reverse the decree and remand the cause to afford him an opportunity to exhibit his books and papers and have a resettlement of the account. We think he has had the amplest opportunity for reaching a just settlement and has no claim to any further indulgence for that purpose. Seventeen years have elapsed since the business of this concern was ended, and sixteen since the death of his co-partner. The suit was

Va. Dec.]        KELLY *v.* LARGNEY.                83

pending two years in the circuit court.   The case was three
times before a commissioner and before whom he had an
ample opportunity to attend and to exhibit his accounts and
vouchers.   Three reports were made in the case, the last
two of them concurring in finding that he owed the balance
claimed against him, for which the circuit court rendered
the decree appealed from.   We think that he has no reason
to ask for further time and opportunity to make his defence,
and that justice to the widow and children of his deceased
co-partner requires that this litigation shall now be ended.

The facility and certainty with which he could have shown
that he did not owe the debt which was claimed of him, and
his plain duty to have done so if that had been the fact, and
the many opportunities and occasions which he has had of
doing so in the progress of this cause, without having availed
himself of any of them, is, we think, an overwhelming ar-
gument in favor of the correctness of the decree.

We think there is no error in the decree and that it ought
to be affirmed.

### (Endorsement on Back of Opinion.)

"Affirmed for reasons stated in writing and filed with the
record.   In this opinion Judges Moncure, Christian, Ander-
son and Staples concur.   Judge Bouldin concurs in that
part of it which sustains the jurisdiction of a court of chan-
cery in the cause, but dissents from the opinion on the
merits."